Fidler *v.* Zoning Board of Adjustment (et al., Appellant).

Argued May 3, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

reargument refused July 24, 1962.

*Charles M. Bolich,* with him *Robert V. Ritter,* for appellants.

*W. Hamlin Neely,* for appellee.

OPINION BY MR. JUSTICE EAGEN, June 28, 1962:

The appellants, John Jaindl and Fred J. Jaindl, are owners of 42 acres of farm land in an essentially rural area of Upper Macungie Township, Lehigh County,

Pennsylvania. Planning the operation of a turkey farm thereon, they sought a zoning permit for the construction of certain buildings necessary to the operation. The zoning officer of the township granted the permit. An abutting landowner, Brooke Y. Fidler, appealed the grant of the permit to the township board of adjustment. The board dismissed the appeal. Fidler then appealed to the Court of Common Pleas of Lehigh County. No additional testimony was taken. The court, upon the record presented, concluded that the board committed an error of law and an abuse of discretion, reversed, and revoked the permit. The landowners, John and Fred J. Jaindl, appeal.

Since the issue was decided by the court below solely upon the record before the board, the scope of our review is limited to whether or not the evidence supports the board's factual findings and whether or not the board abused its discretion or committed an error of law in making its decision: *Tidewater Oil Co. v. Poore*, 395 Pa. 89, 149 A. 2d 636 (1959); *Magrann v. Zoning Bd. of Adj.*, 404 Pa. 198, 170 A. 2d 553 (1961).

The township zoning ordinance, effective January 1, 1959, divided the municipality into four classifications or districts, namely, "Residential," "Agricultural," "Commercial," and "Industrial." The land involved is located in that area zoned "Agricultural."

The section of the zoning ordinance pertinent to an "agricultural" district provides as follows: "Section 501. USE REGULATIONS. A building may be erected or used, and land may be used or occupied for any of the following purposes, and no other: 1. Any use permitted in R1-Residential District (Class 1). 2. *Agriculture and all business incidental to the processing and marketing of farm products, except as excluded in Section 502 hereof.*[1]

---

[1] Emphasis supplied.

"Section 502. USE EXCEPTIONS. The erection or use of land and buildings for the following purposes is hereby prohibited: 1. The use of garbage as feed. 2. Commercial slaughterhouses, canneries, grain elevators, warehouses, markets, auctions, bazaars, stockyards, cold storage houses, deep freeze plants, gristmills, feed and grain mills, fertilizer plants, tallow mills and all other pursuits of a commercial nature; provided however, that the Board of Adjustment may grant a special exception and allow any of the above mentioned prohibited uses if the land and buildings are owned by and are to be operated by an agricultural cooperative association, grange or other organization of farmers, the majority of whom reside in Upper Macungie Township, subject to such rules and regulations as the Board of Adjustment may deem necessary in order to comply with the spirit of this ordinance."

The board concluded that the contemplated use of the land was agricultural and, hence, a proper use under the terms of the ordinance. The prime question for our decision is the correctness of this ruling. The contestant-appellee contends that the business intended is a large-scale commercial venture, is not agricultural, and is specifically prohibited under Section 502(2) of the ordinance which proscribes against "all other pursuits of a commercial nature."

The facts are as follows: The appellants purchase from a source in California between 150,000 and 400,000 turkey eggs annually. The eggs are hatched at Wennersville, Pennsylvania. The poults are presently raised and housed on appellants' properties at Huckleberry Hill and Siegersville, Pennsylvania. It is intended to establish a similar raising and housing plant on the land involved.

Between 40,000 and 50,000 poults will be transported from the hatching site and housed in fifteen "pole barns," elevated above the ground, to be con-

structed on a portion of the land in question. They will be so housed and fed until six or seven months old, when they will be trucked to another site beyond the township limits for the purpose of butchering and processing for market. A portion of the land will be cultivated for the purpose of growing grain to be used as feed, but the yield will be sufficient to feed no more than 3000 or 4000 turkeys a year. The remaining feed necessary will be purchased and transported from outside sources. The "pole barns" will accumulate annually 900 tons of manure.

The use contemplated is definitely "commercial." Whether or not it is "agricultural," as well, is the perplexing problem.

Since the township ordinance failed to define "agriculture" or "agricultural," the term must be interpreted and applied in accordance with its usual and generally accepted meaning: Statutory Construction Act of May 28, 1937, P.L. 1019, §33, 46 P.S. §533; *Commonwealth v. Bay State Milling Co.*, 312 Pa. 28, 167 A. 307 (1933); and, *Commonwealth Tr. Co. Mtg. Invest. Fund Case*, 357 Pa. 349, 54 A. 2d 649 (1947). The word "agriculture" is a derivative of two Latin words, "agri" meaning field, and "cultra" meaning cultivation. In its narrowest sense, it concerns the tilling and cultivating of the soil. See, *Commonwealth v. Carmalt*, 2 Binney 235 (1810). However, it has from an early date reasonably and logically assumed a much broader meaning.

Webster's New International Dictionary (2d ed. 1961) defines "agriculture" as: "The art or science of cultivating the ground, and raising and harvesting crops, often including also feeding, breeding, and management of livestock; tillage; husbandry; farming; in a broader sense, the science and art of the production of plants and animals useful to man, including to a variable extent the preparation of these products for

man's use and their disposal by marketing or otherwise. In this broad use it includes farming, horticulture, forestry, dairying, sugar making, etc."

The Oxford Universal Dictionary (3d ed. 1955) defines "agriculture" as: "The science and art of cultivating the soil; including the gathering in of the crops and the rearing of livestock; farming (in the widest sense)."

3 C. J. S. Agriculture §1, page 365, states: "In a limited sense, 'agriculture' is the cultivation of grain and other field crops for man and beast; but, in a broader sense, the word signifies the science or art of producing plants and rearing animals useful to man, including certain matters incidental thereto." Also on the same page "agriculture" is: "the art or science of cultivating the ground, including harvesting of crops and rearing and management of livestock." on page 366, it states: "The distinction between arable agriculture, which includes the cultivation of the ground and the growth of crops, and pastoral agriculture, which comprises merely the feeding and management of the flocks and herds of the farm, has been observed since the earliest times: 'Abel was a keeper of sheep, but Cain was a tiller of the ground.'" See also, *Hardy v. Gapen*, 141 Pa. Superior Ct. 101, 14 A. 2d 892 (1940).

It is fundamental that restrictions imposed by zoning ordinances are in derogation of the common law and must be strictly construed: *Rolling Green Golf Case*, 374 Pa. 450, 97 A. 2d 523 (1953); *Lord Appeal*, 368 Pa. 121, 81 A. 2d 533 (1951); and, *Medinger Appeal*, 377 Pa. 217, 104 A. 2d 118 (1954). Such restrictions must not be so construed as to fetter the use of the land by implication. The permissive widest use of the land is the rule and not the exception, unless specifically restrained in a valid and reasonable exercise of the police power.

Viewing the ordinance in this light, it is our conclusion that the use proposed of the land in question is proper and permitted under Section 501 (2) thereof. Clearly, the word "agriculture" therein does not mean only the tilling of the soil. The raising and housing of turkeys is well within the reasonable meaning of the term. It is significant that the term "agriculture" was used and not "farming," which might well impose a far different connotation. This was, undoubtedly, done with deliberate purpose. Also, the words "business incidental to the processing and marketing of farm products" are influential. No restrictions were attached and the meaning intended, therefore, must be all inclusive and comprehensive.

Nor are we convinced that because this agricultural venture includes a large-scale commercial activity that it is precluded under Section 502(2). This section restricts itself to the conduct of certain specified commercial pursuits except under defined conditions. It was not intended to entail an agricultural business. Further, the number of turkeys to be raised and housed on the property is no more controlling than the number of cattle on a dairy farm would be if such an application were involved. Likewise, the fact that only a relatively small quantity of the necessary feed will be cultivated on the property is not conclusive. If this concept were correct, an ordinary dairy farm would be precluded if it purchased the necessary needs of the stock from outside sources.

Finally, the argument asserted that the general provision of the ordinance as to "Prohibited Uses" (Section 806) forbids the agricultural enterprise involved is not persuasive. This provides: "No lot or parcel of land shall be used for the following purposes: . . . (d) Any trade, industry or business that is noxious or offensive by reason of odor, dust, gas smoke, vibration, illumination, or noise, or that constitutes a public hazard whether by fire, explosion or otherwise."

This prohibition has no application to agricultural districts and was not so intended. Such a construction would completely nullify and destroy the entire agricultural provision of the ordinance. Every farm gives off odors of manure, cattle, chickens, turkeys, fertilizers etc., all of which are offensive to the uninitiated nostril. Such aroma is "the usual" in agricultural areas.

An ordinance, like a statute, must be construed, if possible to give effect to all of its provisions: Statutory Construction Act, supra, Sections 51 & 52 (2); and, *Commonwealth v. McHugh,* 406 Pa. 566, 178 A. 2d 556 (1962).

Guided by these considerations, the inevitable conclusion is that when the township prohibited therein any trade or business that is offensive by reason of odor, noise, etc., it did not intend these words to include such odors and noises that are inseparable from ordinary farming or agricultural activity.

We find no abuse of discretion or error of law in the decision of the board of adjustment.

The order of the court below is reversed.