## Peterson, Appellant, v. Zoning Board of Adjustment.

Argued October 9, 1963. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*J. William Ditter, Jr.,* with him *Ditter & Jenkins,* for appellants.

*Bernard G. Segal,* with him *Shirley S. Bitterman, Arthur J. Sullivan, Knox Henderson,* and *Schnader, Harrison, Segal & Lewis,* and *Henderson, Wetherill & O'Hey,* for intervenor.

OPINION BY MR. JUSTICE MUSMANNO, November 27, 1963:

Warner Company, intervenor in this appeal, decided some time prior to January, 1956, to go into the concrete mixing business in Whitemarsh Township, Montgomery County, provided they could be assured that this use would be permitted at the point they intended to buy property which was then zoned *Industrial.* After suitable inquiry they were advised by Michael J. Laputka, Secretary Treasurer of the Township, on January 23, 1956, that the proposed "Concrete Mix Plant" could be erected on the land specified and that the adjoining land "can be used for storage which would be customarily incidental to the operation of a concrete mix plant." With this assurance, Warner purchased the 3-acre tract under consideration and put up a large sign thereon, stating that Warner Company would erect on the site a "Central Mix Concrete Plant."

On April 12, 1961, Warner Company applied for a plant construction permit and, much to their surprise and dismay, the permit was refused. They appealed to the zoning board of adjustment which sustained the

building inspector's rejection of the application. They then appealed to the Court of Common Pleas of Montgomery County, which remanded the record to the zoning board for further testimony, findings and order. A second public hearing followed and additional evidence was taken. The board then, on January 25, 1962, reversed its original decision and directed the issuance of the building permit with certain conditions which were readily accepted by Warner. Several property owners in the vicinity protested the permit and appealed to the court of common pleas, which sustained the board. The protestants appealed to this Court.

It appears that in 1958 the township re-zoned the area in which the Warner property was located, without notifying Warner of its intentions in this respect, changing the zoning of the land from *Industrial,* where a concrete mixing plant was unquestionably permitted, to *Limited Industrial* where, according to the township inspector, a concrete mixing plant was prohibited.

Warner argued before the board and the court below, as it does here, that the zoning amendment of 1958 was invalid on the grounds of vagueness, obscurity, looseness of language, lack of notice and in other respects. The board and the court of common pleas, with a commendable respect for practicality, and celerity in disposing of the main issue, found that it was unnecessary to spend time unraveling the tangle of the amendment which somehow produced several conflicting maps, charts and descriptions. The board held that, assuming that the amendment did properly rezone the property from industrial to limited industrial, the proposed plant was still within the legal periphery of what is allowed in a limited industrial area.

The only question thus before us is whether the board abused its discretion in coming to the conclusion it reached, and whether the court of common pleas, in

its turn, went beyond its prescribed limitation in reviewing what was done by the board.[1]

Section 1401 of the Whitemarsh Township Zoning Ordinance provides, inter alia: "the following uses shall not be permitted: . . . cement including cement mixing plant, lime, gypsum, or plaster of paris manufacture."

The appellants contend that the use intended by Warner violates this proscription. They argue that what Warner will operate is actually a *cement* mixing plant, even though all the evidence shows that it is a *concrete* mixing plant. The appellants seek to get around this difference in nomenclature by asserting that cement and concrete are really the same thing. They say:"So far as the general public is concerned, the terms 'cement' and 'concrete' are used without distinguishing between them."

Judicial notice covers a world of subjects and continents of knowledge but in all its vastness it does not recognize the arid deserts of malapropisms. In the first place, it is not true that the general public does not know the difference between cement and concrete, but even if this claim made by the appellants were to be accepted, the court could still not found its decision on what does violence to correct language, assaults the dictionary and invites etymological chaos. In so specific a writing as a municipal ordinance, words are to be taken at their lexicographical value and not as they appear in the umbrage of slovenly colloquialisms. In addition, zoning regulations must be construed strictly, since they impose restrictions on the free use of property and are in derogation of the common law. (*Phi Lambda Theta Zoning Case,* 400 Pa. 60, 64.)

---

[1] *Freed v. Power,* 392 Pa. 195; *Fidler v. Zoning Board,* 408 Pa. 260.

The appellants maintain that the ordinance intended to ban sand entirely from limited industrial zones. They say: "It [the ordinance] excludes the use of cement no matter what end result is to be produced. It forbids the use of cement no matter what the circumstances may be."

This interpretation takes leave of the realm of common sense and encroaches into the domain of absurdity. If there is one thing which the statute of construction forbids, it is absurd results. Why would any municipality forbid the use of cement which has become to construction what salt is to the table? Would the appellants argue that the ordinance would prohibit a householder from paving his patio or the floor of his bathroom, if he used in the process, a bucket of sand?

A glance at the section in controversy reveals that what the ordinance drafters had in mind was manufacture and production, not the naked use of cement. The crucial clause reads: "cement, including cement mixing plant, lime, gypsum, or plaster of paris *manufacture*." (Emphasis supplied).

If the township had wanted to exclude the manufacture of concrete within its borders, all the drafters of the ordinance would have had to do would be to add the word "concrete" between "gypsum" and "or plaster of paris manufacture." The omission to do so, especially in view of the fact that the drafters were in that subject matter of enumeration, makes it practically conclusive that the word "concrete" was omitted for a reason. They knew that there was nothing inherently objectionable about the production of concrete, whereas cement manufacture does work discomfort to the inhabitants of the vicinage. The chief engineer of Warner, Arthur I. Martindale, testified to the burning processes which go into the manufacture of cement. Webster's International Dictionary (1961 edition) bears this out in its definition of cement: "A

powder made from alumina, silica, lime, iron oxide, and magnesia *burned* together in a kiln and finely pulverized which when mixed with water to form a plastic mass hardens by *chemical* combination and by gelation and crystallization and is used as an ingredient of mortar and concrete". (Emphasis supplied).

This chemical combustion produces fumes which can be deleterious to sensitive membranes and it could also be detrimental to certain types of property. Thus, there is every reason to assume that that is why the *manufacture* of cement is prohibited in the limited industrial area of Whitemarsh Township. The production of concrete, on the other hand, produces no smoke, fumes, or dust. Turning to Webster's dictionary again, we find concrete defined as: "A hard, strong building material made by mixing a cementing material (commonly portland cement) and a mineral aggregate (as washed sand and gravel or broken rock) with sufficient water to cause the cement to set and bind."

Cement manufacture and concrete manufacture are processes so wholly different one from the other that to use cement and concrete interchangeably is to defy the evidence of the senses, challenge the intelligence of mechanical engineers and disorganize the whole building industry. Cement is, of course, an indispensable ingredient of concrete, but it is only part of it. It is not the whole of it. Hydrogen is an essential component of water, but without the addition of oxygen, it could never satisfy a thirst.

Cement is to concrete what flour is to fruit cake. One can understand a municipality prohibiting a flour mill within its precincts because of the clouds of dust it creates, clogging the atmosphere and whitening the country round, but to say that once a housewife obtains flour and mixes it with the spices, nuts and fruits which go into a fruit cake she is violating an

ordinance which prohibits the manufacture of flour is the very icing of the cake of grotesqueness.

Cement, as already stated, is vital to the production of concrete but, standing alone, it cannot do what concrete does. To build one's house entirely of cement is to erect it on a foundation of sand, but to build one of concrete is to erect a structure which will break the gnawing teeth of time. Cement is perishable, concrete is imperishable; cement is of the moment, concrete is of the centuries. Concrete is man-made stone, it is scientific granite, it is a mosaic steel. In the construction of bridges, buildings, dams, piers, embankments, conduits, and aqueducts, it is nonpareil. Concrete takes railroad trains over rivers, it makes shallow rivers navigable, and makes unruly rivers tame, it holds up mountainsides, it stores the food of a nation, it provides for habitation in climes and altitudes otherwise uninhabitable. The court below properly found that the prohibition of cement-mixing in the limited industrial area could have no restrictive effect whatsoever on concrete-mixing.

The protestants also complain that the Warner plant violates that provision of the ordinance which states that the mixing operation must be enclosed within a building or in a court enclosed on all sides. On this subject the lower court found: "The evidence discloses that the mixing operations will be fully enclosed and that the conveyor delivering the materials to the head of the plant will also be covered and enclosed."

The Warner office building and the boiler house are separate buildings but there is no need to read into the prohibitory provision that all phases of the operation must be under one roof. Such a limitation would benefit no nearby property and would constitute an unreasonable curtailment of the use of one's property. An ordinance must be read to avoid, if possible, an arbitrary and capricious interpretation. The

purposes of the requirements have been adequately served by having the concrete-mixing activities enclosed.

We are satisfied that the record amply justifies the findings and conclusions of the board and the court. The order of the court is, therefore,

Affirmed.