2023 PA SUPER 70

| | | |
|---|---|---|
| CRYSTAL HAND | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| OSCAR G. FULLER AND SANDRA R. | : | No. 1357 EDA 2022 |
| FULLER | : | |

Appeal from the Judgment Entered May 4, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 191201853

BEFORE: BOWES, J., McCAFFERY, J., and SULLIVAN, J.

OPINION BY McCAFFERY, J.:                    **FILED APRIL 20, 2023**

Crystal Hand (Tenant) appeals from the judgment[1] entered in the

Philadelphia County Court of Common Pleas in favor of Oscar G. Fuller and

Sandra R. Fuller (Landlords), in her action seeking rent abatement pursuant

to Philadelphia's Lead Paint Disclosure and Certification Ordinance.[2] The trial

court granted Landlords' motion for a compulsory nonsuit and denied Tenant's

---

[1] Tenant purports to appeal from the "order entered in this matter on May 4, 2022." **See** Tenant's Notice of Appeal, 5/19/22. However, no order was entered in this matter on May 4th. Rather, after the trial court denied Tenant's motion to remove a nonsuit on April 13, 2022, Tenant praeciped for the entry of judgment on May 4th. "[I]n a case where nonsuit was entered, the appeal properly lies from the judgment entered after denial of a motion to remove nonsuit." **Billing v. Skvarla**, 853 A.2d 1042, 1048 (Pa. Super. 2004). Thus, we have corrected the caption to reflect the appeal is from the **judgment** entered May 4, 2022.

[2] **See** Philadelphia Code, Chapter 6-800, *et seq*.

motion to remove the nonsuit. On appeal, Tenant argues the trial court erred in concluding her lease was a "renewal lease" exempt from the requirements of the ordinance, and that, in any event, she failed to provide Landlords with the requisite 10 days to cure their purported violation. For the reasons below, we affirm.

The facts underlying this appeal are as follows. On September 17, 2002, the parties entered into a one-year residential lease (2002 Lease) for an apartment on 57th Street in Philadelphia, Pennsylvania. The lease provided for two occupants, one adult and one child. *See* Lease, 9/17/02, at ¶¶ 7-8. Relevant herein, the lease included the following paragraph:

> 16. RENEWAL; LEASE CHANGE
>
> The Landlord may offer the Tenant, in writing, a new lease to take effect at the end of this Lease. The Landlord will also notify the Tenant, in writing, if the Landlord decides not to offer the Tenant a new Lease.
>
> If offered, the new lease may include changes. The Landlord will notify the Tenant of any proposed new lease, or non-renewal, at least thirty (30) days before the end of the present Lease.
>
> If notice of non-renewal is given, Tenant agrees to vacate at the end of the Lease term. The Tenant may also give notice of non-renewal to the Landlord in writing at least thirty (30) days before the end of the present lease.
>
> In the event neither the Landlord or the Tenant give notice of non-renewal to the other, the Lease will continue for another Term of one (1) year with the rest of the Lease remaining the same.

*Id.* at ¶ 16. Further, the lease stated that "[a]ny changes must be written and signed by . . . Landlord[s] and . . . Tenant in order to be enforceable." *Id.* at § 33. This lease agreement was signed by both parties. *See id.* at 7.

- 2 -

Tenant continued to reside at the apartment for the next 17 years. She claimed the parties executed a second lease in 2006 (2006 Lease), when her monthly rent increased, and a third lease in 2013 (2013 Lease). *See* N.T., 11/22/21, at 19-20. The "new" 2013 Lease included the following changes: (1) a rent increase; (2) an additional child occupant; and (3) a term of month-to-month. *Id.* at 20.

In May of 2019, Tenant stopped paying rent.[3] *See* N.T. at 34-35. She received a 10-day eviction notice in August of 2019, and subsequently agreed to vacate the property. *Id.* at 34, 44.

After vacating the property, Tenant filed a civil complaint against Landlords pursuant to Philadelphia's Lead Disclosure and Certification Ordinance on December 12, 2019. *See* Tenant's Complaint, 12/12/19, at 2-3 (unpaginated). She subsequently filed a first amended complaint on February 4, 2020. Tenant asserted that she "entered into a **new lease** [with Landlords], effective December 17, 2013," at which time, they failed to "provide [her] with a valid Certification prepared by a lead inspector stating that the property was Lead Free or Lead Safe" as required by the Ordinance. Tenant's First Amended Complaint, 2/4/20, at 2 (unpaginated; emphasis added). Thus, pursuant to the remedies provided for in the Ordinance, Tenant sought a refund of $40,500 for rent paid from September 17, 2013, as well as

---

[3] Tenant claimed she did so because she "felt like [she] was being taken advantage of[,]" when Landlords failed to make necessary repairs to the apartment. *See* N.T. at 32.

reasonable attorneys' fees and costs.[4] *Id.* at 3. Tenant attached three documents to her amended complaint: (1) a signed copy of the parties original 2002 lease; (2) an **unsigned** copy of a purported lease dated December 7, 2013; and (3) a handwritten list of requested repairs dated May 9, 2019. *See id.* at Exhibits A-C.

The matter proceeded to a non-jury trial conducted on November 22, 2021. Tenant testified on her own behalf, and then rested her case. At that time, Landlords moved for a compulsory nonsuit, and presented a written brief to the court. *See* N.T. at 52-53. Landlords summarized that Tenant was not entitled to relief under the Ordinance for two reasons: (1) the Ordinance exempts renewal leases from its requirements; and (2) Tenant did not provide Landlords with the required 10-day notice to cure their non-compliance. *See id.* at 53-56. The trial court provided Tenant 10 days to file a brief in response, which she did.

On December 9, 2021, the trial court granted Landlords' motion for compulsory nonsuit, and issued the following "Findings[:]"

> The 2013 [L]ease at issue is the second renewal lease between the parties for the same property at . . . N. 57th Street . . .

---

[4] Tenant does not explain how she arrived at her requested damages of $40,500. By our calculation, however, this number equates to the amount of rent she paid from December of 2013, when the parties entered into the purported "new lease," until December of 2018, when her second child reached the age of 7 ($675 per month for 60 months). As will be discussed *infra*, the ordinance requires lessors to disclose the presence of lead paint only in certain dwellings in which a child aged six or under will reside. *See* 2012 Edition at § 6-802(12).

pursuant to the initial lease entered into in 2002. Accordingly, the applicable lead disclosure ordinance exempted renewals; and further would have required 10 day notice to comply with the lead ordinance before commencing suit, which was not done.

Trial Ct. Findings, 12/9/21.

Tenant filed a timely motion to remove the nonsuit on December 17, 2021, which the trial court denied on April 14, 2022. On May 4th, Tenant praeciped for entry of judgment, and subsequently filed this timely appeal.[5, 6]

Tenant presents the following issues for our review:

1. Did the trial court err in holding that [Tenant's] lease is a renewal lease exempted from the requirements of Section 6-803(3)(a) of the Philadelphia Lead Paint Ordinance as that provision existed at the time [Tenant] brought suit?

   a. Did the trial court err as a matter of law in rendering this holding when the undisputed evidence in the record was that the lease contained different terms from those of any prior lease between the parties and Pennsylvania law provides that a lease cannot be a "renewal lease" if it contains different terms?

   b. Did the trial court err in purporting to make a "finding" that the lease was a renewal lease when it was ruling on a motion for a compulsory nonsuit and the record contained evidence supporting a contrary result?

2. Did the trial court err in holding that [Tenant] could not recover under Section 6-809(3) of the ordinance because she did not provide [L]andlords with [10] days advance notice to comply with the ordinance before she brought suit?

   a. Did the trial court err as a matter of law in rendering this holding even though nothing in Section 6-809(3)

---

[5] Tenant complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

[6] Landlords did not file an appellee brief with this Court.

references a notice or cure period as a prerequisite to seeking a remedy for its violation?

b. Did the trial court err in holding that [Tenant] did not provide notice, if such notice was required?

c. Did the trial court err in purporting to make a "finding" that [Tenant] failed to comply with a [10]-day notice requirement when it was ruling on a motion for a compulsory nonsuit and the record contained evidence supporting a contrary result?

Tenant's Brief at 5-6.

Pursuant to Pa.R.C.P. 230.1, upon a motion of the defendant, a trial court "may enter a nonsuit . . . if, at the close of the plaintiff's case on liability, the plaintiff has failed to establish a right to relief." Pa.R.C.P. 230.1(a)(1). When deciding whether a nonsuit is warranted, the trial court "shall consider only evidence which was introduced by the plaintiff and any evidence favorable to the plaintiff introduced by the defendant prior to the close of the plaintiff's case." Pa.R.C.P. 230.1(a)(2). On appeal to this Court,

> entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with [the] appellant receiving the benefit of every reasonable inference and resolving all evidentiary conflicts in [the] appellant's favor. We will reverse the trial court only if the trial court abused its discretion or made an error of law.

*Kiely on Behalf of Feinstein v. Philadelphia Contributionship Ins. Co.*, 206 A.3d 1140, 1145 (Pa. Super. 2019) (citations & quotation marks omitted).

Furthermore, we note that "a lease is a contract and is . . . to be interpreted according to contract principles." *Mace v. Atlantic Refining Marketing Corp.*, 785 A.2d 491, 496 (Pa. 2001). Thus, we must "ascertain and give effect to the intent of the contracting parties[,]" recognizing that "the

- 6 -

intent of the parties to a written contract is contained in the writing itself." *Id.* (citations & quotation marks omitted). It is well-established that "the interpretation of a lease is a question of law and this Court's scope of review is plenary." *Tri-State Auto Auction, Inc. v. Gleba, Inc.*, 257 A.3d 172, 184 (Pa. Super. 2021) (citation omitted). The issues presented in this case also require our interpretation of a city ordinance. "An ordinance, like a statute, must be construed, if possible to give effect to all of its provisions[.]" *Fidler v. Zoning Bd. of Adjustment of Upper Macungie Twp.*, 182 A.2d 692, 695 (Pa. 1962) (citations omitted).

Tenant seeks relief pursuant to Philadelphia's Lead Paint Disclosure and Certification Ordinance, contained in Chapter 6-800 of the Philadelphia Code.[7] The Ordinance was enacted in 1995 to "assist the Department of Health in identifying, reducing, and combating lead poisoning in Philadelphia children." *See* Current Edition at § 6-801(8).[8] Recognizing that "[t]he most significant

---

[7] Our research has revealed no appellate decisions interpreting this ordinance.

[8] The lead paint disclosure requirements have been amended several times during the 20 years Tenant leased the property from Landlords. For our purposes, the 2011, 2012, 2017, and Current Editions of the ordinance are relevant. These documents are attached as exhibits to Landlord's motion for compulsory nonsuit and appended to Tenant's brief. *See* Landlord's Motion for Compulsory Nonsuit, 11/22/21, Exhibit A, The Philadelphia Code (10th Edition 2011 (2011 Edition); February 2014 Cumulative Supplement (2012 Edition); Bill No. 180936-A, eff. 10/1/20 (Current Edition); Tenant's Brief at 59 (Current Edition), 62 (February 2013 Cumulative Supplement (2012 Edition)), 61 (Bill No. 160687-AAA, eff. 2017 (2017 Edition)), 64 (2011 Edition).

*(Footnote Continued Next Page)*

remaining source of environmental lead is lead-based paint in housing built prior to 1978[,]" the ordinance requires lessors and sellers of properties built before March 1978, in which a child age six or under will reside, to disclose to a seller or lessee "the absence or presence of lead-based paint or lead-based paint hazards." *See id.* at §§ 6-801(5), 6-802(14), 6-802.1(1), 6-803(1).

In 2002, when the parties entered into their original lease, Section 6-803 of the ordinance required a seller or lessor to "disclose the absence or presence of lead-based paint or lead-based paint hazards" to a buyer or lessee "[b]efore any buyer or lessee [was] obligated under any contract to purchase or lease residential housing constructed prior to 1978[.]"[9]  2011 Edition at § 6-803(1).  In addition, Section 6-804 required lessors to provide lessees with written notice of their right to conduct a lead inspection, at their own expense, and their right to rescind the lease if the inspection revealed lead-based paint hazards.  *See id.* at 6-804(2).  The "Remedies" provision in Section 6-809 provided that if a lessor failed to comply with the requirements of Sections 6-

_____

The 2011 Edition was the same ordinance in effect at the time the parties entered into their original lease in September of 2002.  The 2012 Edition was in effect at the time the parties entered into the purported "third lease" in 2013.  The 2017 Edition was in effect when Tenant filed her complaint in the underlying matter in December of 2019.  The Current Edition of the ordinance reflects amended language that took effect on October 1, 2020, after Tenant vacated the property and instituted the present action.

[9] The ordinance further required "[a]ll lessors with **existing leases**" to comply with the disclosure requirements within 90 days after the ordinance took effect.  2011 Edition at § 6-803(3) (emphasis added).  Tenant does not seek any relief pursuant to this subsection.

803 or 6-804, a lessee would be "entitled to damages in the amount of double the reasonable cost of a comprehensive residential lead inspection plus attorney's fees and costs." *Id.* at § 6-809(2). However, the remedy was contingent upon the lessee **first notifying** the lessor "of the non-compliance in writing" so that the lessor would have "**ten (10) days to remedy** the non-compliance" before the lessee could "bring a court action[.]" *Id.* at § 6-809(2)(a) (emphasis added).

Sections 6-803 and 6-809 were amended effective December 2012 in two ways relevant to the issues raised herein. First, the lead disclosure obligations of buyers to sellers and lessors to lessees were separated into different subsections. A **lessor's disclosure requirements** were set forth in Section 6-803(3):

> (a) No lessor shall enter into a lease agreement with a lessee, **other than a renewal lease**, to rent any Targeted Housing,[10] or a unit in such Targeted Housing, unless (.1) he or she provides the lessee with a valid certification prepared by a certified lead inspector stating that he property is either lead free or lead safe; and (.2) the lessee acknowledges receipt of the certification by signing a copy.
>
> \*    \*    \*
>
> (c) **Upon entering into such a lease agreement**, the lessor shall (.1) provide a copy of the signed certification to the

---

[10] The ordinance defined "Targeted Housing" as most residential properties built before March of 1978 in which a child "aged six (6) and under" resided or would reside. *See* 2012 Edition at § 6-802(12). For our purposes, there is no dispute that the apartment Tenant leased was in a building built before March of 1978, and, during certain periods of her tenancy, Tenant resided with a child under the age of seven.

> Department of Public Heath; and (.2) provide to the tenant, in addition to any written notifications required by applicable laws, a written notification advising the tenant to perform a visual inspection of all painted surfaces periodically during the term of the lease, and advising that the tenant may inform the lessor of any cracked, flaking, chipping, peeling, or otherwise deteriorated paint surfaces.  Upon receipt of any such tenant notification the lessor shall promptly inspect and correct any defective conditions as required by . . . the Philadelphia Property Maintenance Code[.]

2012 Edition at § 6-803(3)(a), (c) (emphases added).  Notably, the 2012 Edition exempted "**renewal leases**" from the disclosure requirements.

Second, Section 6-809 was amended to provide more remedies for a lessee when a lessor failed to comply with the disclosure requirements of Section 6-803.  Pursuant to Section 6-809(3), when a lessor did not comply with the provisions of **Section 6-803**, a lessee was "entitled to[,]" *inter alia*, (1) "an order requiring the lessor to provide the required certification[;]" (2) "damages for any harm caused by the failure to provide the certification;" and (3) "**abatement and refund of rent** for any period in which the lessee occupies the property without a certification having been provided[.]"  2012 Edition at § 6-809(3)(a), (b), (d) (emphasis added).  Moreover, the amendment appeared to remove the notification and 10-day compliance requirement from violations of Section 6-803.  Rather, the notification and subsequent 10-day compliance provision appeared in subsection (a), of Section 6-809(2) — which only discussed remedies available when a lessor failed to comply with the provisions of **Section 6-804** ("Right to Conduct

Independent Inspection or Risk Assessment and to Right to Rescind").[11] **See**
**id.** at § 6-809(2)(a).

The next relevant amendment to the ordinance took effect in 2017. The
2017 edition continued to exclude renewal leases from the Section 6-803
disclosure obligations, but omitted all reference to the notification and 10-day
compliance period previously required before a lessee could seek any remedy
for a lessor's noncompliance. **See** 2017 Edition at §§ 6-803(3)(a), 6-809.

Lastly, we note that the current edition of the ordinance, which includes
an amendment effective October 1, 2020, mandates the disclosure
requirements for both new and renewal leases. **See** Current Edition at § 6-
803(3)(a) ("No rental license . . . shall be issued **or renewed** to a lessor with
respect to any Targeted Housing . . .").

With this background in mind, we consider Tenant's arguments on
appeal. First, Tenant insists the trial court erred when it determined the
parties' 2013 Lease was a "renewal lease" — exempt from the requirements of
the ordinance — and not a new lease. **See** Tenant's Brief at 26. She insists
that because three terms in the 2013 Lease were different from those in the
2002 Lease — the period of her lease changed from year-to-year to month-to-
month, the rent increased, and the occupancy limit increased from one child
to two children — the 2013 Lease could not be considered a "renewal lease"

---

[11] The remedy for a failure to comply with Section 6-804 remained damages
in the amount of double the cost of a lead inspections. **See** 2012 Edition at §
6-809(2).

- 11 -

as defined by the Pennsylvania Supreme Court in ***Aaron v. Woodcock***, 128 A. 665 (Pa. 1925). ***See*** Tenant's Brief at 27-28, ***citing Aaron***, 128 A. at 666 ("To renew a lease implies . . . all terms of the new lease . . . are to be the same as those contained in the original lease[.]"). Further, because the ordinance does not define "renewal lease," Tenant maintains that Philadelphia City Counsel intended it to have the same meaning as set forth in ***Aaron***. Tenant's Brief at 28.

Tenant also argues that the fact the 2013 Lease was not signed is of no moment. As she points out, the Landlord and Tenant Act of 1951 provides that a lease for a term not more than three years "need not be in writing." ***See*** Tenant's Brief at 30, *citing* 68 P.S. § 250.201. She also emphasizes that Paragraph 16 in the parties' 2002 Lease provided that Landlords could offer Tenant a new lease in writing that might contain changes. ***See*** Tenant's Brief at 31. She claims that is exactly what happened in 2013. ***Id.*** at 31-32.

Lastly, Tenant contends the ending of the trial proceeding was "garbled" and it was unclear if Landlords were moving for a compulsory nonsuit after resting their case without presenting any evidence. ***See*** Tenant's Brief at 32-33. She maintains the court's subsequent "Findings" were inappropriate because the court disposed of the case by compulsory nonsuit. ***Id.*** at 33-35. Moreover, Tenant insists the court's "finding" that the 2013 Lease was a "renewal lease" was erroneous since the "undisputed facts" demonstrated that the 2013 Lease contained different terms than the 2002 Lease. ***Id.*** at 36.

In determining the 2013 Lease was a "renewal lease" exempt from the disclosure requirements of § 6-803, the trial court opined:

It is undisputed that the parties never signed a new lease after the first one in 2002. The first lease expired in August 2003, but [Tenant] remained in the property after that date and [Landlords] accepted the rent she paid. The renewal of the lease continued in 2004, 2005, 2006, and all subsequent years until 2018 ([Tenant] vacated before the 2019 lease was renewed).

[Tenant] did not provide this Court with any evidence that a new lease — instead of a renewal lease — had been created. [Tenant] argued that, because the rent and number of occupants changed, the terms of the original lease had changed, and the lease between the parties could not be considered a renewal lease. [Tenant] did not provide any legal authority for this claim.

Importantly, the original lease in 2002 stated that, if neither side gave notice that they wanted to end the lease, the lease would automatically renew for another year. Although the rent increased in 2006 and 2013, [Tenant] paid those increases without demanding a new, written lease. [Tenant's] acquiescence in paying the increased rent, and [Landlords'] consent to the continued tenancy by accepting that rent, created a series of renewal leases for a one-year term. Here, both case law, and the language in the lease itself, created renewal leases because neither side ever indicated that they wanted to end the tenancy (until 2019).

Because all of the leases after the first one were renewal leases, and because renewal leases are exempt from the lead-free certification requirements, this Court was statutorily bound to find that [Landlords] were not required to comply with §6-803(3)(a). If [Landlords] were not required to comply with §6-803(3)(a), then none of the statutory remedies for violating the statute were available to [Tenant], and this Court properly granted the nonsuit.

Trial Ct. Op., 10/11/22, at 5 (unpaginated).

We agree with the trial court's analysis. Tenant focuses solely on her contention that the 2013 Lease was a "new" lease, rather than a "renewal" lease, because it contained three different terms. However, Section 6-

803(3)(a) does not limit "renewal leases" to those with identical terms. Rather, the 2012 Edition of the ordinance states: "No lessor shall **enter into a lease agreement** with a lessee, **other than a renewal lease**, to rent any Targeting Housing . . . unless" they provide the requisite lead paint disclosure. 2013 Edition at § 6-803(3)(a). The language appears to differentiate a lease agreement between **new parties** from renewal agreements between existing parties — it does not require a lessor to comply with the lead paint disclosure requirements when a lease is renewed between the same parties, even if a few of the terms are modified.

Tenant's reliance on **Aaron** does not compel a different result. In that case, the parties entered into a 10-year lease, beginning September 1914, for "the sum of $585 per month . . . during the" 10-year term. **See Aaron**, 128 A. at 666. The lease contained the following provision: "At the expiration of this lease, said [tenant] to have the privilege of **re-leasing** the said premises at the yearly rental of $7,200, payable monthly at $600 per month." **Id.** (emphasis added; internal citations omitted). The issue on appeal was whether the tenant was "entitled to a new term of [10] years at the expiration of [the original] lease period, or whether he was entitled to a term from year to year only." **Id.**

In concluding that the new lease provided for only a yearly term, as opposed to a 10-year term, the Supreme Court opined:

> [T]he privilege granted is **not to renew the old lease at an increased monthly rent, but to re-lease the premises on the basis of a yearly rental**. In other words, instead of following

the form of the original lease and mentioning simply the amount of the monthly payments, as increased, the idea of an annual term is suggested by naming an annual rental.

There is a distinction between the ordinary meaning of words, such as 'the privilege of **renewing this lease**,' which appear in the cases relied on by [the tenant], and words such as 'the **privilege of re-leasing said premises**, at a yearly rental,' etc., which appear here. To renew a lease implies not only a leasing again of the premises, but more, in that it conveys the definite idea that all the terms of the new lease, including the period during which it is to run, are to be the same as those contained in the original lease; for to 'renew' is to 'revive' or 'restore to existence', while to 're-lease' means simply to 'lease again' or 'to grant a new lease of[.]' This difference of meaning between 'renew' and 're-lease' has significance here, as we shall presently indicate, though, of course, under some circumstances the words might be used to express a like meaning.

*Aaron*, 128 A. at 666 (citations omitted).

Thus, the *Aaron* Court did not define the term "renewal lease" as Tenant contends — rather it observed that the parties in that case used the term "re-lease" rather than "renew" in their agreement. Clearly, when the landlord entered into a contract for a 10-year term, with the option to "re-lease" the premises "at [a] yearly rental," the plain meaning of the agreement was not to "renew" the 10-year term. *See Aaron*, 128 A. at 666. Thus, *Aaron* is not controlling.

Tenant also emphasizes that Paragraph 16 of the 2002 Lease permitted Landlords to offer her a "new lease" in writing at the end of the original lease term. *See* Tenant's Brief at 31. Again, we do not find that this reference to a "new lease" in the parties' agreement has any bearing on whether the lease was a "renewal lease" for purposes of the Lead Paint Disclosure Ordinance.

- 15 -

We further agree with the trial court that had the parties intended to enter into a "new lease," they would have both signed and executed the 2013 document, as was required by the terms of their agreement.[12] **See** Lease, 9/17/02, at ¶ 33 ("Any change [of the lease] must be written and signed by the Landlord and the Tenant in order to be enforceable.").

As noted **supra**, we have uncovered no appellate decisions interpreting the ordinance. However, in January of 2019, the Honorable Lisa Rau of the Philadelphia County Court of Common Pleas issued an opinion in **Houston v. Analaris Homes, Inc.**, 2019 WL 419489 (C.C.P. Phila. Jan. 30, 2019), pertinent to the claims raised herein. Although we recognize that common pleas court decisions "are not binding precedent[,]" we may consider them for "their persuasive authority." **Darrow v. PPL Elec. Utilities Corp.**, 266 A.3d 1105, 1112 n.6 (Pa. Super. 2021) (citation omitted).

In **Houston**, the tenant and the landlord entered into a one-year lease beginning in May of 2015. **Houston**, 2019 WL 419489 at *1. The tenant never (2) informed the landlord that a young child would be residing at the property, (2) raised any concerns about the presence of lead paint during the tenancy, and (3) notified the landlord "that she wanted a lead certification."

---

[12] Although, as Tenant points out, the Landlord and Tenant Act of 1951 provides that a lease for a term not more than three years "may be leased . . . by oral or written contract or agreement[,]" where, as here, the parties explicitly agreed that any changes must be in writing, the language of the lease controls. **See** 68 P.S. §250.201; **Mace**, 785 A.2d at 496 ("When the words of a contract are clear and unambiguous, the meaning of the contact is ascertained from the contents alone.").

*Id.* The landlord did not renew the lease after the one-year term, and the tenant moved out in May of 2016. **Six months later**, the tenant filed a lawsuit "in an effort to get a complete rent refund and other money damages, claiming that . . . her landlord[ ] had not provided a lead certification" pursuant to Section 6-803(3)(a).[13] *Id.*

Judge Rau entered a directed verdict for the landlord based on several deficiencies in the tenant's claims. *See* Houston, 2019 WL 419489 at *2, *7. Relevant herein, Judge Rau concluded that the premises was not "Targeted Housing" when the tenant filed her claim because the ordinance applied only to "current lease agreements" and not to those terminated months earlier.[14] *See id.* at *7-*9. She opined:

> The language of the Ordinance precludes the type of case brought by [the tenant]. The premises was not "Targeted Housing" when [the tenant] filed the claim because that term is defined in relation to the formation of new leases, not ones that terminated months previously. Moreover, the terms "lessor" and "lessee" are used exclusively throughout the Ordinance, and the technical and ordinary usages of these terms **preclude a claim when there is no existing lessor-lessee relationship**. **[The**

---

[13] At all relevant times in **Houston**, the 2012 Edition of the ordinance was in effect.

[14] Judge Rau also determined: (1) the tenant did not notify the landlord that a child aged six or under would be living at the premises, and in fact, "affirmatively misled" landlord by asserting that no children would be living there; (2) the tenant failed to provide the landlord with 10 days notice that they had not received the lead paint certification before filing suit; and (3) the tenant "failed to offer credible evidence that she was the sole payer of rent" in support of her request for a rent refund. **See Houston**, 2019 WL 419489 at *7.

- 17 -

**tenant] would have the Court ignore this language to make the Ordinance apply to any terminated lease agreement, something the law does not permit.**

The term "Targeted Housing" is defined in the Ordinance "[f]or purposes of the provisions of this Chapter **relating to lease agreements**." Phila. Code § 6-802(12) (emphasis added). This narrow focus is reiterated in a later section of the Ordinance, again limiting the term "Targeted Housing" to "residential property built before March 1978 in which children age six (6) and under reside **during the lease term**." *Id.* at § 6-803(3)(b). [The tenant's] interpretation of the Ordinance ignores language about current lease agreements which must be given effect.

\* \* \*

The language of the Ordinance shows that its scope is limited to the formation of lessor-lessee relationships. Section 6-803(3), upon which [the tenant] relied, states that "[n]o lessor shall **enter into a lease agreement** with a lessee" unless a lead certification has been provided and the lessee has acknowledged receipt. ***Id.*** at § 6-803(3)(a) (emphasis added). The section then requires lessors to take certain steps "[u]pon entering into such a lease agreement." ***Id.*** at § 6-803[(3)](c). This limited scope is also apparent in Section 6-804(2), which states that the Ordinance applies to "[e]very lease" and permits the lessee in a current lessor-lessee relationship to void the lease agreement if lead is discovered on the premises. The regulations these provisions place on how parties enter into a lessor-lessee relationship reflects the Ordinance's focus on prevention: young children cannot even move into premises unless they are deemed lead safe so poisoning does not occur in the first place.

[The tenant] would insert the word "former" before the terms "lessor" and "lessee" throughout the text, but ordinances cannot be rewritten to include language omitted by the legislature. The terms "lessor" and "lessee" are used exclusively throughout the Ordinance, and no reference is made to former lessors or former lessees. The Ordinance states that "[w]here a **lessor** does not comply with any provision of Section 6-803, the **lessee** shall be entitled to bring an action in a court of competent jurisdiction." Phila. Code § 6-809(3) (emphasis added).

\* \* \*

- 18 -

The Ordinance's unambiguous language precludes [the tenant's] interpretation and is consistent with the Ordinance's focus on preventing the health risk posed to children by lead exposure. There is no evidence in this case that the premises presented a lead hazard or that [the tenant's] child was harmed by living at the premises. **No possible health risk existed when the suit was filed because [the tenant] moved out of the premises six months prior.** Adopting [the tenant's] interpretation would therefore do nothing to further City Council's intent to protect children from lead hazards. Moreover, this Court cannot add language into the Ordinance which City Council chose to omit. **Adopting [the tenant's] interpretation would open the floodgates by permitting lawsuits to be brought by every former tenant who has ever been a party to a lease covered by the Ordinance and claims not to have received a Lead Certificate.**

\* \* \*

It was undisputed that the parties had concluded their lease relationship and no issue about the Ordinance was raised during that relationship. The Ordinance covers those parties who are in an existing lease relationship and for which a violation is found to have occurred. **The Ordinance is not available to prior lessees to bring claims against a prior lessor to retroactively recoup rent after a lease agreement has been satisfactorily completed and when no issues were raised during the existence of the lease. Nor should the Ordinance be used as a tool by a former lessee to retaliate against a prior lessor for not extending their lease for an additional term.**

*Id.* (emphases added).

We agree with Judge Rau's interpretation of the ordinance.[15] Section 6-809(3) permits a "lessee" to bring an action in court when a "lessor does not comply with any provision of Section 6-803[.]" 2012 Edition at § 6-809(3).

---

[15] It is well-settled that this court "may affirm the trial court's order on any valid basis." ***Dockery v. Thomas Jefferson Univ. Hosps., Inc.***, 253 A.3d 716, 721 (Pa. Super. 2021) (citation & quotation marks omitted).

- 19 -

Notably, the ordinance does not provide a remedy for a **former lessee** to retroactively sue a **former lessor** who did not provide the required disclosure at the time the lease was signed. Indeed, as Judge Rau pointed out, the ordinance was not intended to permit former lessees to "retroactively recoup rent after a lease agreement has been satisfactorily completed when no issues were raised during the existence of the lease." **Houston**, 2019 WL 419489, at *9.

Furthermore, we also disagree with Tenant's assertion that the "proceedings at the end of the trial were garbled," as well as her criticism of the court's issuance of "Findings." **See** Tenant's Brief at 32-33. First, at the onset of the trial, Landlords indicated they had filed a "compulsory nonsuit brief" before trial. N.T. at 9. After Tenant rested her case-in-chief, Landlords explicitly moved for a compulsory nonsuit and summarized the argument from their brief. **See id.** at 52-53. The court then asked if Landlords had any testimony to place on the record, to which their attorney responded, "The only testimony would go to my client's knowledge of children, however, it's dependent upon the 10-day notice to cure[.]" **Id.** at 56-57. The trial court asked: "So, in essence, the defense is resting with this submission of this request?" and their attorney replied, "That's correct." **Id.** at 57. Thus, although Tenant characterizes this exchange as "garbled," we disagree. It is clear that Landlords moved for a compulsory nonsuit, and the court provided Tenant with additional time to respond.

We also conclude the court's subsequent issuance of "Findings" was not improper. The "Findings" were not weight of the evidence or credibility determinations. Rather, the court simply provided the reasons for its determination that "no liability exists" under the facts presented by Tenant. *See Kiely*, 206 A.3d at 1145. Indeed, as Tenant herself acknowledges "the trial court's 'finding' that the 2013 [L]ease was a renewal lease was not a finding at all," but instead, a "legal conclusion based on the undisputed facts[.]" Tenant's Brief at 36. While Tenant insists the court's legal conclusion was erroneous, for the reasons above, we disagree. Therefore, Tenant is entitled to no relief on her first issue.

In her second claim, Tenant argues the trial court erred when it determined that she was required to afford Landlords 10 days to cure their failure to provide the requisite lead paint disclosure before filing suit. *See* Tenant's Brief at 37. Tenant insists: (1) the 2017 Edition of the ordinance applicable at the time she filed her lawsuit, omitted the notice requirement entirely; (2) the notice requirement in the 2012 Edition of the ordinance applied **only** to violations of **Section 6-804**, and she is asserting a violation of Section 6-803; and (3) even if notice was required, Tenant's "communications with [L]andlords satisfied the purpose of that requirement." *Id.* at 37-39, 41-43, 50.

Preliminarily, we note that the trial court's ruling concerning the 10-day notice requirement was an alternative holding — and we have already determined that Tenant is not eligible for relief under the ordinance.

- 21 -

Nevertheless, we also agree with the trial court's determination that Tenant's failure to provide the requisite notice is fatal to her claim.

First, we reject Tenant's argument that the 2017 Edition of the ordinance — which omitted the notice requirement — is controlling because she filed her lawsuit in 2019. Tenant sought relief based upon her 2013 lease. Thus, the ordinance in effect at that time is controlling. Otherwise, a tenant would be permitted to ignore a potential lead paint hazard until the ordinance was amended to provide a more favorable opportunity to file suit.[16] This was clearly not the intention of the City Council when it enacted this remedial ordinance. *See* Current Edition at § 6-801(8) ("The purpose of this legislation is to provide an educational tool which will assist the Department of Health in identifying, reducing and combating lead poisoning in Philadelphia children."), § 6-801(9) ("The task of eliminating lead from those properties that house children will be a costly one and will require a public/private collaboration and partnership in order to preserve and to protect Philadelphia's affordable housing stock."). The remedies are available only when remediation is rejected or ignored by the landlord.

---

[16] The facts of this case highlight the potential for abuse. When Tenant signed the original lease in 2002, she moved into the property with her 18-month-old child. *See* N.T. at 12. Although the Lead Paint ordinance was in effect at that time, she seeks no remedy for Landlords' failure to provide a lead paint disclosure when she signed the original lease. Nor does she seek any relief for the period following the birth of her second child (December 2011) until the parties executed the purported "third lease" in December of 2013.

- 22 -

Second, we conclude the 10-day notice requirement in the 2012 Edition of the ordinance **does apply** to Section 6-803 violations. By way of background, we note that, in the 2011 Edition, the only remedy available to a lessee when a lessor failed to comply with either the disclosure requirements of Section 6-803 or the independent assessment privilege set forth in Section 6-804, was damages in the amount of double the reasonable cost of a residential lead inspection. *See* 2011 Edition at § 6-809(2)(a). When the ordinance was amended in 2012, City Council provided additional remedies to a lessee when a lessor failed to comply with the Section 6-803 disclosure requirements. *See* 2012 Edition at § 6-809(3). Nevertheless, the remedy for a violation of Section 6-804 (right to conduct independent inspection) remained the same — "damages in the amount of double the reasonable cost of a comprehensive residential lead inspection[.]" *Id.* at § 6-809(2). However, despite the fact that the amended ordinance provided significantly harsher penalties for a violation of Section 6-803 in Section 6-809(3), the 10-day notice requirement remained as subsection (a) under Section 6-809(2), which referred only to lessor's failure to comply with **Section 6-804**. *See id.* at § 6-804(2)(a). Notably, however, the language of the notice requirement referred **only** to a violation of the **disclosure** requirement:

> Any lessee who has not received **disclosure** shall first notify the lessor of the non-compliance in writing. The lessor shall have ten (10) days to remedy the non-compliance after which his/her failure to comply shall entitle the lessee to ring a court action for all appropriate relief.

*Id.* at § 6-809(2)(a) (emphasis added).

Judge Rau also considered the "peculiar placement" of the notice requirement in the **Houston** decision, and opined that, when read in context, it "appears to be inadvertent, . . . and the broadly worded notice requirement clearly applies to all remedies provided for in the Ordinance." **Houston**, 2019 WL 419489 at *10. Again, we agree.

The notice requirement explicitly states that a lessee "**who has not received disclosure**" must first notify the lessor in writing before filing suit. 2012 Edition at § 6-809(2)(a) (emphasis added). However, the **disclosure** requirements are set forth in Section 6-803, not Section 6-804. Indeed, despite appearing to apply only to violations of Section 6-804, the notice requirement does **not** even refer to the right to conduct an independent inspection or the right to rescind the lease. Therefore, to conclude that it does not apply to the Section 6-803 disclosure requirements — to which it specifically refers — simply flies in the face of the purpose and plain language of the ordinance. Indeed, if we read the ordinance as Tenant proposes, lessees would be required to provide lessors with 10 days to remedy their failure to notify lessees of the right to obtain an independent inspection, as well as their right to rescind the lease — when the only remedy available to a lessee for that violation is double the cost of an assessment. However, under this analysis, lessees would **not** be required to provide lessors with notice of their failure to provide the requisite **disclosure** — although that is what is specifically referred to in the subsection — when the failure to provide that disclosure can lead to much more severe penalties, such as the refund of rent

for any period during which a lead safe certification is not provided. This interpretation cannot be reconciled with the remedial purpose of the statute, and the context in which it is presented. *See Fidler*, 182 A.2d at 695.

Lastly, we note that to the extent Tenant insists she did comply with the notice requirements, based upon her "communications with" Landlords, we disagree. *See* Tenant's Brief at 50. Tenant states that she included "peeling paint among repair issues that needed to be addressed" in her May 2019 handwritten repair list, although she acknowledges that she did not "explicitly use the word 'lead[.]'" *Id.* at 50-51. Nevertheless, she claims that "as she made these complaints, she expressed '[her] concern about lead.'" *Id.* at 51, *citing* N.T. at 43.

Accepting Tenant's testimony as true,[17] the ordinance requires that a lessee notify a lessor of their "non-compliance" with the disclosure requirements in **writing**. *See* 2012 Edition at § 6-809(2)(a). A written list of repairs which simply identifies peeling paint does not satisfy this notice requirement — nor does Tenant's assertion that she "expressed '[her] concern about lead'" **verbally** to Landlords. *See* Tenant's Brief at 51 (citation omitted). Therefore, this argument, too, fails.

Upon our review, we detect no abuse of discretion or error of law in trial court's determination that Tenant is not entitled to relief pursuant to the City

---

[17] *See Kiely*, 206 A.3d at 1145.

of Philadelphia's lead paint disclosure ordinance. **_See Kiely_**, 206 A.3d at 1145. Thus, we affirm the judgment entered in favor of Landlords.

Judgment affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 4/20/2023*