J-S05041-25          2025 PA Super 66

SHANNON COOPER AND JOHN     :    IN THE SUPERIOR COURT OF
COOPER ON BEHALF OF     :       PENNSYLVANIA
THEMSELVES, AND A CLASS OF     :
SIMILARLY SITUATED PERSONS     :
    :
        Appellants     :
    :
    :
       v.     :    No. 2385 EDA 2024
    :
    :
SGYS ST. IVES, LLC AND     :
NORTHBROOK MANAGEMENT, LLC     :

Appeal from the Order Entered August 21, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 230601451

BEFORE:   BOWES, J., MURRAY, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:            **FILED MARCH 19, 2025**

Appellants, Shannon Cooper and John Cooper, brought this action against Appellee apartment complex, SGYS St. Ives, LLC and Northbrook Management, LLC d/b/a Northbrook Apartments. Appellants sought rent abatement through alleging a violation of Philadelphia's Lead Paint Disclosure and Certification Ordinance, ("lead disclosure ordinance" or "the ordinance"), Phila. Code, Chapter 6-800, *et seq.*, although there is no allegation that lead has even been detected at Northbrook Apartments. Appellants appeal from the order entered in the Philadelphia County Court of Common Pleas on August

_____

[*] Former Justice specially assigned to the Superior Court.

21, 2024, granting judgment on the pleadings in favor of Appellee. After a careful review, we affirm.[1]

The relevant facts and procedural history are as follows: Appellants entered into a lease agreement for an apartment unit located at 2334 Ashwood Avenue in Philadelphia on April 6, 2019. The unit is one of 516 rentable units of the Northbrook Apartments owned and managed by Appellee SGYS. The 2019 lease was attached to the Complaint as "Exhibit I." The 2019 lease for unit 2334 was renewed by Appellants in the spring of 2020, 2021, and 2022, although the renewal lease agreements for those years were not included in the pleadings. Compl. ¶¶ 9, 11, 14; Answer ¶¶ 9, 11, 14.

---

[1] The Pennsylvania Superior Court, not the Commonwealth Court, properly has jurisdiction over the action to interpret a lease and to determine if Appellee apartment complex violated the lead ordinance because this matter does not invoke the limited set of circumstances under 42 Pa.C.S.A. § 762. This is not a regulatory criminal charge; this is a civil matter between private parties, not against a municipality or agency such as the City of Philadelphia or the Department of Public Health, and Appellee is not a "corporation not-for-profit." 42 Pa.C.S.A. § 762(a)(2), (5).The ordinance through which Appellants seek relief regulates the affairs of sellers/lessors and buyers/lessees, not political subdivisions, or other local authorities. 42 Pa.C.S.A. § 762(a)(4)(i)(A), (B). Finally, this Court's research has revealed only one appellate case concerning the application of Philadelphia's lead ordinance, and it was published by this Court, not the Commonwealth Court. **Hand v. Fuller**, 294 A.3d 468 (Pa. Super. 2023). As neither party objected to this Court's jurisdiction, judicial economy is served by this Court deciding the matter. **See Zikria v. Western Pennsylvania Hosp.**, 668 A.2d 173, 173-74 (Pa. Super. 1995) (exercising jurisdiction over the appeal involving a nonprofit corporation in the interest of judicial economy because neither party objected to this Court's jurisdiction); **Gordon v. Phila. County Democratic Exec. Comm.**, 80 A.3d 464, Pa. Super. 2013) (exercising jurisdiction over appeal involving the Election Code and the right of an elected committeewoman to office in the interest of judicial economy and because appellee did not object to this Court's jurisdiction).

The 2019 lease for unit 2334 contains a Lead Paint Notice as required by city ordinance. The notice, which was signed by both Appellants in 2019, reads as follows:

A Lead Paint Notice is required by City Ordinance.

EVERY LESSEE OF ANY INTEREST IN RESIDENTIAL PROPERTY ON WHICH A RESIDENTIAL DWELLING WAS BUILT PRIOR TO 1978 IS NOTIFIED THAT SUCH PROPERTY MAY PRESENT EXPOSURE TO LEAD FROM LEAD-BASED PAINT MAY PLACE YOUNG CHILDREN AT RISK OF DEVELOPING LEAD POISONING. LEAD POISONING IN YOUNG CHILDREN MAY PRODUCE PERMANENT NEUROLOGICAL DAMAGE, INCLUDING LEARNING DISABILITIES, REDUCED INTELLIGENT QUOTIENT, BEHAVIOR PROBLEMS AND IMPAIRED MEMORY. LEAD POISONING ALSO POSES A PARTICULAR RISK TO PREGNANT WOMEN. THE LESSOR OF ANY INTEREST IN RESIDENTIAL REAL PROPERTY IS REQUIRED TO DISCLOSE TO THE LESSEE THE PRESENCE OR ABSENCE OF ANY LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS. A COMPREHENSIVE LEAD INSPECTION OR RISK ASSESSMENT FOR POSSIBLE LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IS RECOMMENDED PRIOR TO LEASE.

Within 10 days from the final signing of this Lease, Tenant can pay for a comprehensive lead inspection and risk assessment of the rental property by a certified lead paint inspector and to obtain a report. If the inspection report states that lead-based paint or lead-based paint hazards exist in the rental property, Tenant has two (2) business days after receiving the report to end this Lease by delivering written notice to Landlord together with a copy of the report. If Tenant ends the Lease, Tenant will get back all rent and security deposit paid to the Landlord. If Tenant does not get an inspection within the permitted 10 days, or does not end this Lease within two (2) days after getting the report, Tenant gives up the right to get an inspection or end this Lease.

Compl. Ex. I.

The 2019 lease for unit 2334 further contains a Housing Transaction Lead Risk Statement, which reads as follows:

- 3 -

Philadelphia Department of Public Health determined that most housing built in Philadelphia before 1978 contains dangerous lead paint. This property was built [] before 1978. Therefore, without a comprehensive lead inspection, conducted by a certified lead inspector, showing there is no lead paint or there are no lead based paint hazards, you can assume this property likely contains lead based paint.

CERTIFICATE OF DISCLOSURE FORM
In accordance with §6-806 of the Health Code, I certify that I have:
a) received either the results of a comprehensive lead inspection and risk assessment of this property by a certified lead inspector or received a statement by the Philadelphia Department of Health concerning the risk of lead-based paint and/or lead-based paint hazards in housing built before 1978;
b) received and read the lead warning statement in my lease or agreement of sale;
c) received the attached lead hazard information pamphlet;
d) been provided a ten (10) day opportunity to obtain an inspection for the presence of lead-based paint and/or lead paint hazards.

Compl. Ex. I. Both Appellants signed the certificate of disclosure form. *Id*. We note that Appellants do not allege that they obtained or ever sought to obtain a lead paint inspection and risk assessment of their unit as described in the above notice. They also do not allege the presence of lead-based paint or any lead hazard in unit 2334 or at the Northbrook Apartments generally.

On April 1, 2022, while Appellants remained tenants of unit 2334, Northbrook Apartments became subject to the lead disclosure ordinance at Phila. Code, Chapter 6-800, *et seq*. **See** Phila. Code § 6-802(14). Prior to becoming subject to the ordinance, on March 24, 2022, Appellee engaged a licensed and certified lead inspector, Matitia Charbit of AAA Lead Professionals, to detect the presence of lead. A "Lead-Based Paint Evaluation Report" was

- 4 -

prepared on March 28, 2022. New Matter Ex. A. The report describes the methodology of testing for lead and summarizes the findings for the Northbrook Apartments property. *See id*. The report states that the inspection was performed in accordance with Housing and Urban Development (HUD) guidelines. *Id.* at 4. The inspector took a total of 1,090 readings from a random sample of twenty-eight units and received zero positive readings for lead based paint. *Id*. Based on these results, the report concludes that "all" 516 units at the Northbrook Apartment complex are free of lead hazards. *Id*. The report includes the following language:

> It should be understood that an anomaly or lead painted component could exist in areas not inspected; however the probability of such an occurrence is low. We can only certify that the components that we have tested have met the definition of being lead based paint free.
>
> * * *
>
> AAA Lead Professionals LLC is responsible only for areas tested as of the date of inspection. Areas not tested in this report may not be assured as being lead safe.

*Id.* at 2; 5.

The report contains a "Certification of Lead Free Status" signed by the risk assessor and dated March 28, 2022. *Id.* at 56. The certificate includes an acknowledgement of receipt by a tenant which was unsigned. *Id*. Finally, the certificate includes this notice:

> Pursuant to Philadelphia Code Title 6, chapter 6-800, SS 6-803(3)(c) the Landlord/Agent of the above property must give a copy of this certificate to the Tenant/Lessee and send a copy of the tenant-signed certificate along with a copy of the dust wipe

> sample test results for this dwelling to the Department of Public Health.

*Id*. Appellee emailed this certificate to Appellants, as well as to other tenants, on April 13, 2022, to the email listed on the lease.[2] New Matter ¶ 14. Appellants, who did not sign the certificate, aver that Appellee was required to obtain Appellants' acknowledgement of receipt of the certificate to be in compliance with the lead disclosure ordinance. Reply ¶ 12. Appellants further allege that because only certain units were tested for lead using random sampling, excluding unit 2334, the requirements of the ordinance were not satisfied. Reply ¶ 11.

Appellee submitted the lead-free certification to the City of Philadelphia Department of Public Health through the department's online portal. New Matter. ¶ 16. On April 30, 2022, the City of Philadelphia renewed Appellee's rental license for all 516 units of Northbrook Apartments, including unit 2334. New Matter, Ex. B. Appellee's rental license was renewed by the City of Philadelphia for the period April 30, 2022 to April 30, 2023, and again for the period April 30, 2023 to April 30, 2024. New Matter, Ex. C.

Appellants filed their complaint on June 14, 2023, in the form of a class action. Appellee filed a timely answer with new matter on March 26, 2024. Appellants filed a reply to the new matter on April 5, 2024. On June 24, 2024,

_____

[2] The email address listed on Appellants' lease is the same email address Appellants used to electronically sign their complaint in this action.

Appellee filed a motion for judgment on the pleadings. Appellants opposed the motion on July 15, 2024, and Appellee filed a reply brief in further support of the motion on July 23, 2024. On August 21, 2024, the Honorable Paula A. Patrick entered an order and opinion granting Appellee's motion and dismissing Appellants' claims under the lead disclosure ordinance with prejudice. Appellants filed a notice of appeal on September 6, 2023, and a Rule 1925(b) statement on September 23, 2024. The trial court adopted its August 21, 2024, opinion in lieu of issuing a new 1925(a) opinion on September 30, 2024. This appeal followed.

Appellants raise these issues, verbatim, for our review:

1. Did the trial court commit an error of law in determining that the Appellee's lead testing satisfied the requirements of Phila. Code § 6-803(3)(a)(.1), where the Code does not authorize random sampling, the Appellant's unit was never tested for lead paint and never determined to be lead free/lead free, and the lead test performed by Appellees expressly provided that "[a]reas not tested in this report may not be assured as being lead safe"?

2. Did the trial court commit an error of law in determining that the Appellee did not violate the requirements of Phila. Code § 6-803(3)(a)(.2), which provides that the tenant must "acknowledge[ ] receipt of the certification by signing a copy", where there was never a certification for Appellants['] unit to sign, and Appellants never signed and acknowledged a certification?

3. Did the trial court commit an error of law in applying the standard for judgments on the pleadings where the Appellees right to judgment was not clear and free from doubt, and there were material facts in dispute?

Appellant's Br. at 2-3.

We begin with our standard of review:

> Our scope and standard of review in an appeal of an order granting a motion for judgment on the pleadings is well settled: this Court applies the same standard as the trial court and confines its consideration to the pleadings and documents properly attached thereto. We must determine whether the trial court's action respecting the motion for judgment on the pleadings was based on a clear error of law or whether there were facts disclosed by the pleadings which should properly go to the jury. We will affirm the grant of judgment on the pleadings only if the moving party's right to succeed is certain and the case is so free from doubt that trial would clearly be a fruitless exercise.

*LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 389 (Pa. Super. 2008) (citation omitted). The issues presented in this case require the application of a city ordinance. "An ordinance, like a statute, must be construed, if possible to give effect to all of its provisions[.]" *Fidler v. Zoning Bd. of Adjustment of Upper Macungie Twp.*, 182 A.2d 692, 695 (Pa. 1962) (citations omitted).

Appellants seek relief pursuant to Philadelphia's Lead Paint Disclosure and Certification Ordinance.

> The Ordinance was enacted in 1995 to "assist the Department of Health in identifying, reducing, and combating lead poisoning in Philadelphia children." *See* Current Edition at § 6-801(8). Recognizing that "[t]he most significant remaining source of environmental lead is lead-based paint in housing built prior to 1978[,]" the ordinance requires lessors and sellers of properties built before March 1978, in which a child age six or under will reside, to disclose to a seller or lessee "the absence or presence of lead-based paint or lead-based paint hazards." *See id.* at §§ 6-801(5), 6-802(14), 6-802.1(1), 6-803(1).

*Hand v. Fuller*, 294 A.3d 468, 473 (Pa. Super. 2023). This Court has found this ordinance to apply only to current tenants. *See id.* at 479. Appellee asserted as a defense and maintain on appeal that Appellants are not lawful

"tenants" because they stopped paying rent months before initiating this action, and thus Appellants do not have standing to bring this action. New Matter ¶ 7. We will begin with the issue of standing although the trial court did not address it.

There is a dispute between the nature of the parties' landlord-tenant relationship in 2023 which makes the issue of standing particularly relevant. Appellants aver that they renewed their lease for a twelve-month term in the spring of 2023. Compl. ¶ 17. Appellee denied that the Coopers renewed the lease in 2023. Answer ¶ 17. Appellee claims that in February 2023, it made a written offer to the Coopers to renew the lease for their unit, but that the offer expired. *Id*. We note that neither party has attached as an exhibit the alleged 2023 renewed lease or the alleged expired written offer. Appellee asserts that the last payment the Coopers made for unit 2334 was on April 5, 2023 in the amount of $114.60, purportedly to cover the first few days of rent for the month of April. *Id*. It is Appellee's position that once the Appellants stopped paying rent as required under the lease, they ceased to be "tenants, lessees or lawful occupants" of unit 2334. Answer ¶ 20. Thus, at the time Appellants filed their complaint on June 14, 2023, Appellee considered them "former tenants."

However, Appellants continue to occupy unit 2334. Compl. ¶ 20. It is the position of Appellants that they have been "tenants at all times material hereto" because they deem Appellee to be in violation of the lead disclosure

ordinance. Reply ¶ 3. If a landlord is in violation of the lead disclosure ordinance, "the lessor shall be denied the right to recover possession of the premises or to collect rent during or for the period of noncompliance." Phila. Code § 6-809(4). Thus, Appellants aver that despite not paying rent, Appellee's alleged noncompliance with the ordinance prevents Appellee from terminating the tenancy and collecting rent, and thus Appellants remain lawful tenants under the lease agreement. Reply ¶ 4.

"[T]he ordinance applie[s] only to 'current lease agreements' and not to those terminated months earlier." *Hand*, 294 A.3d at 477-78. Thus, to determine if the Appellants have standing, we must look to the language of the lease between the parties' to determine if the lease was terminated.

24. END OF LEASE OR RENEWAL.

(a) Either party may end this Lease at the end of the original Term by written notice. Landlord or Tenant must receive this notice at least 60 days before the end of the Term.

(b) This Lease will automatically renew for 1 year if neither party ends the Lease at the end of the original Term or of any renewal term. Automatic renewal will not change the terms of this Lease, except that the rent for each renewal term is increased to market rent, as determined by Landlord, with a minimum increase of 7% above current rent.

(c) Landlord may increase the rent or change any other term of the Lease for any renewal period by sending written notice to Tenant. Landlord must send this notice at least 60 days before the end of the Term or of any renewal term. Tenant may reject the renewal terms by sending written notice to Landlord 60 days prior to the end of the current lease ending date. Tenant must then vacate at the end of the current Term. The Lease will renew on the terms set forth in Landlord's renewal notice if Tenant does not send notice ending the Lease.

(d) If this Lease ends and Tenant has not vacated on the ending date, Tenant must pay double the last monthly rental charge. This rental charge is due for each month that Tenant remains in possession of the Leased Unit.

(e) If Tenant breaches lease for any reason, Landlord can begin eviction proceedings without written notice. Tenant waives or gives up Tenant's right to a Notice to Move out or Quit unless a different notice period is stated here[.]

Compl. Ex. I at ¶ 24. Further, these remedies are included, allowing a landlord

to terminate the lease:

28. LANDLORD'S REMEDIES.
Tenant is in breach of this Lease if Tenant fails to make rental payments when due or fails to comply with any other provision of the lease.

If Tenant breaches this Lease:

(a) Tenant must immediately pay all rents for the balance of the term of this Lease and Landlord may sue for this rent.

(b) Landlord may end this Lease.

(c) Landlord may evict Tenant.

(d) Landlord may sue Tenant to collect any monies due, including, but not limited to legal fees and costs to enforce lease terms. Tenant agrees to pay all legal fees and costs.

(e) To the extent allowed by law, Landlord may discontinue any utility services to the Leased Unit.

(f) Landlord may exercise any one or more of the other remedies available to it under law or in equity.

(g) Tenant agrees to waive the 15 or 30 day notice period which is contained in Section 501 of the Landlord and Tenant Act of 1951, as amended, 68 P.S. 250.501. LANDLORD MAY FILE SUIT AGAINST TENANT TO ENFORCE THE TERMS OF THE LEASE WITHOUT NOTICE TO TENANT.

(h) Tenant must pay Landlord's costs of enforcing this Lease including legal fees, whether or not suit is begun, as additional rent.

Compl. Ex. I at ¶ 28.

Appellee asserts that Appellants' claims are barred because their lease ended before they commenced this action. New Matter ¶ 7. Appellee also states that Appellants materially breached the lease by failing to pay rent, rendering the lease unenforceable against Appellee. New Matter ¶ 8. However, by the plain language of the lease, it automatically renews with the same terms unless either party terminates the lease with sixty days written notice. Compl. Ex. I at ¶ 24(a). Appellee does not purport to have given sixty days' written notice to Appellants terminating the lease. The last rent payment made by Appellants was on April 5, 2023. If Appellee believed that Appellants were in breach of the lease by failing to pay after that date, Appellee had the right to end the lease, evict Appellants, and/or sue Appellants for the rent money. Appellee does not purport to have taken any of these actions.

By the plain language of the lease, Appellee had a duty to take specific action against Appellants in order to end the lease. Because Appellee did not do so, and because the Appellants still occupied unit 2334 at the Northbrook Apartments at the time of filing their complaint, the Appellants are "tenants" under the ordinance. Even if the Appellants were in breach of the lease, it does not make them "former" tenants as Appellee suggests. Thus, Appellants had standing to commence this action.

Appellants' first issue is that the trial court erred in determining that Appellee's lead testing methods satisfied the lead ordinance. Specifically, Appellants argue that Appellee randomly tested only about 5 percent of the units at the apartment complex, and Appellants' unit was not one of the units tested. Appellants' Br. at 13. There is no dispute that unit 2334, which the Coopers occupy, was not one of the units that were tested for lead. Appellants assert that the ordinance does not authorize random sampling. *Id.* at 17.

Appellee argues that the ordinance does not require an inspector test a particular unit to conclude that it is lead free. Appellee's Br. at 24. Appellee states that its licensed and certified inspector complied with U.S. Department of Housing and Urban Development (HUD) and Environmental Protection Agency (EPA) guidelines which expressly allow for random sampling. *Id.* at 26. Finally, Appellee argues that if its methods of lead testing were unacceptable, the City of Philadelphia would not have approved Appellee's rental license for Northbrook Apartments year after year. A lessor is required to obtain a rental license to rent any space to a lessee in Philadelphia, but the Department of Licenses and Inspections will "not issue any license unless such inspections as may be required by this Title have been made." Phila. Code § 6-503(1)(c.3). The fact that the City of Philadelphia renewed Appellee's license to rent Northbrook Apartments in 2022 and each year since indicates that the lead inspections of Appellee's property were satisfactory. Appellee's Br. at 28.

First, we disagree with Appellants that there is an "absence of any reference in the Code to 'sampling' in multi-building, multi-unit properties." Appellants' Br. at 17. The lead ordinance makes multiple references to dust wipe "samples" or "sampling." Further, Appellants include no authority for their assertion that "a sampling of only 5% of the dwelling units in a multi building, multi-unit property built before 1978 cannot" sufficiently determine that the property is lead free. *Id*. The lead ordinance states:

> A valid certification that a property is lead safe under this section shall state that the certified lead inspector determined that the property or unit was free of any Deteriorated Paint, and that interior dust *samples* were collected in compliance with *EPA regulations, including 40 C.F.R. § 745.227* and any amendments or successor regulations, were tested and were found not to contain Lead-Contaminated Dust as defined in this Chapter. The certification shall be accompanied by a copy of the corresponding laboratory results of wipe tests for lead-contaminated dust.

Phila. Code § 6-803(3)(b) (emphasis added). A review of EPA regulations found at 40 C.F.R. § 745.227 reveals the methodologies that are appropriate for lead risk assessment. The section states, "Documented methodologies that are appropriate for this section are found in the following: The U.S. Department of Housing and Urban Development (HUD) Guidelines[.]" 40 C.F.R. § 745.227(a)(3).

The HUD guidelines state as follows:

> Use of the multi-family protocol is less time-consuming and more cost effective than inspecting all units in a given housing development or building because in most instances a pattern can be determined after inspecting a fraction of the units. The number

> of units tested is based on the date of construction and the number of units in the housing development.

U.S. DEP'T OF HUD, *Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing*, Office of Healthy Homes and Lead Hazard Control, 2ed at 7-36 (July 2012). The guidelines include a chart showing that for a complex with between 500 and 776 units built between 1960 and 1977, a random sample of twenty-eight units must be tested. ***Id.*** at 7-40. Northbrook Apartments has 516 units and was built between 1960 and 1977, so twenty-eight is precisely the number of units that Appellee's inspector tested.

The inspector completed the certificate and included with it a report of the procedures and methods he used, clearly stating that only twenty-eight out of the 516 units were tested. New Matter Ex. A at 4. Appellee submitted this to the Department of Public Health. The City of Philadelphia subsequently licensed Appellee's property for rent, obviously finding that all "inspections as may be required by this Title have been made," including the lead inspection. Phila. Code § 6-503(1)(c.3). Appellants have not alleged or shown that the Department of Public Health issued Appellee a rental license when a lead risk assessment had not been properly completed and certified. Accordingly, since Appellants cite no authority undermining the EPA and HUD guidelines' approval of random sampling, and since the City of Philadelphia determined that Appellee complied with the ordinance by issuing yearly rental licenses, we conclude that the trial court did not err in determining that Appellee's lead testing satisfied the requirements of the lead disclosure ordinance.

Appellants' second issue is that trial court erred in determining that Appellee did not violate the requirements of Phila. Code § 6-803(3)(a)(.2). Appellants' Br. at 19. Specifically, the ordinance provides that tenants must acknowledge receipt of the lead-free certification by signing it, but the Coopers never signed the lead-free certification. **Id**.

A lessor's disclosure requirements are set forth in Section 6-803(3):

> No rental license under Chapter 9-3900 shall be issued or renewed to a lessor with respect to any Targeted Housing, and no lessor shall enter into a lease agreement with a lessee to rent any Targeted Housing, or a unit in such Targeted Housing, unless (.1) he or she provides the lessee with a valid certification prepared by a certified lead inspector stating that the property is either lead free or lead safe; (.2) the lessee acknowledges receipt of the certification by signing a copy; (.3) the lessor has provided to the Department of Public Health a copy of such certification.

Phila. Code § 6-803(3)(a).

Pursuant to section 6-809(3), when a lessor does not comply with the above requirements of section 6-803, a lessee is "entitled to[,]" *inter alia*, (1) "an order requiring the lessor to provide the required certification[;]" (2) "damages for any harm caused by the failure to provide the certification;" and (3) "abatement and refund of rent for any period in which the lessee occupies the property without a required certification having been provided[.]" Phila. Code § 6-809(3)(a), (b), (d).

Here, it is undisputed that the Northbrook Apartments are "targeted housing" under the ordinance as of April 1, 2022. It is undisputed that the parties renewed their lease for the year May 2022 to May 2023. Compl. ¶ 15;

Answer ¶ 15. Appellee avers in its answer and new matter that "Plaintiffs received a copy of the Lead-Free Certification via email on April 13, 2022." New Matter ¶ 15. In Appellants' reply to new matter, Appellants state, "Denied. This is a legal conclusion to which no response is necessary and it is therefore denied." Reply ¶ 15. Appellants are incorrect that this is a legal conclusion; whether they received the certification by email on April 13, 2022 is a clear factual averment, not a conclusion of law.

Under Pa.R.C.P. 1029(b), "averments in a pleading to which a responsive pleading is required are admitted when not denied specifically or by necessary implication." The rule in Pennsylvania is that averments of fact contained in new matter require a specific denial, and the failure to do so constitutes an admission of those facts. *Devine v. Hutt*, 863 A.2d 1160, 1168 (Pa. Super. 2004). Here, Appellants' reply to new matter systematically characterizes Appellee's averments as "conclusions of law" and, in doing so, fails to specifically admit or deny clear factual averments. Where the truth or falsity of a factual averment is clearly within Appellants' knowledge and they failed to specifically deny the fact, we deem it admitted. Thus, we deem it undisputed that Appellee emailed the lead-free certification to Appellants and other tenants of Northbrook Apartments on April 13, 2022, and that Appellants received this email.

Accordingly, we must determine if the lessee's failure to acknowledge receipt of the certification by signing a copy of it when they received it by

email on April 13, 2022 places the lessor in the position of violating the ordinance, and if a lessee could recover for a violation of this nature. The trial court stated the following:

> While The Coopers failed to acknowledge receipt of the certificate [by signing a copy], allowing a tenant to bring a claim for violation of the ordinance solely on this basis would open the door to tenants throughout the city being able to indefinitely live rent-free solely by refusing to acknowledge receipt of the certificate and then claiming a violation of the ordinance. Such a nonsensical result could not have been intended by the legislature.

Tr. Ct. Op. at 4.

Appellants argue that while the trial court acknowledged that the lead-free certificate was never signed by them, the court disregarded the mandatory requirement that the certificate be signed by a lessee. Appellants argue that the trial court was not free to ignore the mandatory requirements of the ordinance and rewrite it under the pretext of interpreting it. Appellants' Br. at 20. We agree with the trial court that under the facts of this case, using Appellants' failure to sign the lead-free certificate as an excuse to claim a violation of the ordinance by Appellee is "nonsensical."

This Court acknowledges that the ordinance requires the lessee to acknowledge receipt of the lead-free certification before a lessor enters into a lease agreement with the lessee. Phila. Code § 6-803(3)(a). However, for the reasons that follow, we hold that a lessee cannot recover under section 6-809

- 18 -

when the only violation of the ordinance is that the certification was not signed by the lessee.[3]

A lessee is entitled to a remedy "where a lessor does not comply with any provision of Section 6-803." Phila. Code § 6-809(3). Section 6-803(3)(a) has three main provisions to be satisfied before the city will issue a rental license or before a lessor enters or renews a lease with a lessee: (1) the lessor must provide the lessee with a lead-free valid certification, (2) the lessee must acknowledge receipt of the certification, and (3) the lessor must provide a copy of the certification to the Department of Public Health. Phila. Code § 6-803(3)(a). As stated above, it is undisputed that Appellee provided the certification to its tenants and to the department, satisfying the first and third provision. It is also undisputed that Appellants did not sign the certificate, and thus there has been a failure to satisfy the second provision. However, it is not the Appellee who failed to comply with the second provision of section 6-803(3)(a). It will never be the lessor failing to acknowledge receipt of the

_____

[3] Although not cited by either party, the Philadelphia Department of Public Health created a guide for landlords to comply with the lead ordinance after the most recent amendment to the ordinance. DEP'T OF PUB. HEALTH CITY OF PHILA., *A Landlord's Guide to the Philadelphia Lead Disclosure and Certification Law* (October 2020), https://www.phila.gov/media/20210223163151/Landlord-Guidance_Oct_2020_2_23_21.pdf. There is a section titled, "What should I do to comply with the law?" which further describes what must be disclosed to tenants. ***Id.*** at 5-6. Relevantly, the guide is silent on the landlord's duty to secure a tenant's signature on the certification; it only instructs landlords to provide to tenants, *inter alia*, the valid certification. ***Id***.

certification as that is not a requirement for the lessor, and a lessor should not be responsible for a provision that the lessee failed to satisfy.

The lead disclosure ordinance states, "[t]he provisions of this Ordinance shall be liberally construed to effectuate its purpose of disclosure." Phila. Code § 6-809(5). The ordinance also provides, "[t]he purpose of this legislation is to provide an educational tool which will assist the Department of Health in identifying, reducing and combating lead poisoning in Philadelphia children." Phila. Code § 6-801(8). This ordinance seeks to keep people, especially children, safe from lead poisoning, and to ensure that property sellers/lessors with older buildings are prioritizing the safety of buyers/tenants. Holding a lessor liable for a lessee's failure to sign a valid, lead-free certification does nothing to effectuate the purpose of this ordinance. It is not the purpose of this ordinance to allow tenants to continue to occupy an apartment rent-free if they believe the requirements of the ordinance have not been met. Indeed, if a reasonable tenant was not provided the required lead-free certification and believed there was a lead hazard in his leased apartment, he would either take steps to ensure the dwelling is safe, or he would seek to terminate the lease pursuant to the "Lead Paint Notice" in the lease.

There is no suggestion that unit 2334, or anywhere else in Northbrook Apartments, has a lead hazard. If Appellants were concerned that there was a lead hazard in their dwelling unit or building, they could have conducted an independent inspection or risk assessment upon the renewal of their lease as

is their right under section 6-804(3) and under their lease. If Appellee's property did not qualify for the lead-free certificate, any corrective action taken in order to qualify the property would have been at the expense of Appellee. Phila. Code § 6-803(3)(b). "Upon a City inspection for lead safety at any property rented by a lessor for which a lessor has not provided the lessee the certification required in this Section, the lessor shall be liable to the City for the costs of such inspection." Phila. Code § 6-803(3)(i). If Appellants had not been provided with the lead-free certification, they were entitled to a court order requiring Appellee to provide the required certification and Appellee would have been required to perform the necessary work to make the property lead-safe. Phila. Code § 6-809(3)(a). There is no assertion that Appellants believed there was a lead hazard in their unit or that they sought an independent inspection. There is no assertion that the lessor failed to provide the city the valid certification or that the city issued Appellee's rental license in error. Appellants did not attempt to obtain a court order, as they had already received the certification that the property is lead-free, and the valid certification was included in the pleadings. Accordingly, Appellants' second claim fails.

Appellants' third claim is that the trial court erred in granting a motion for judgment on the pleadings when there are still disputed facts. Appellants' Br. at 22. Specifically, Appellants argue that it was disputed if they ever received the lead-free certification by mail. *Id.* at 23. However, for the reasons

stated above, we deem it admitted that Appellants received the lead-free certification by email on April 13, 2022. Appellants further dispute the methodology used for lead testing, namely, that the results of a random sample of twenty-eight units could determine that the whole property is lead free. However, Appellee cites and purports to have complied with the EPA and HUD guidelines discussed above. It is Appellants' responsibility to have provided this Court with evidence that Appellee did not follow the appropriate guidelines. Appellants have failed to do so.

Appellants merely claim in their brief that Appellee's inspector did not analyze or elaborate on the results of the lead testing, and that the report prepared by the inspector is an "expert report" of which a trier of fact must determine the credibility. Appellants' Br. at 25. We disagree. The ordinance requires that a certified lead inspector be

> A person who is certified by the Philadelphia Department of Public Health as qualified by training and experience to conduct comprehensive lead inspections and risk assessments, or by the Commonwealth of Pennsylvania as an "inspector-risk assessor" pursuant to the Pennsylvania Department of Labor and Industry's Lead-Based Paint Occupation Accreditation and Certification Regulations; or is certified by the EPA and trained as a lead dust sampling technician.

Phila. Code § 6-802(1). The certified lead inspector must

> determine[] that the property or unit was free of any Deteriorated Paint, and that interior dust samples were collected in compliance with EPA regulations, including 40 C.F.R. § 745.227 and any amendments or successor regulations, were tested and were found not to contain Lead-Contaminated Dust as defined in this Chapter.

Phila. Code 6-803(3)(b).

Here, Appellee's lead inspector, Matitia Charbit of AAA Lead Professionals, is licensed by the state as a lead risk assessor and has passed the state inspector course. New Matter Ex. A at 4. He was not an expert witness retained for litigation in this matter; his conclusions were subject to the scrutiny of the Philadelphia Department of Public Health prior to the city issuing Appellee's rental license, not subject to the credibility determinations of a fact-finder. Appellants claim that the trial court committed an abuse of discretion and error of law by granting Appellee's motion based on the content of the report. Appellant's Br. at 25. However, the trial court did not grant the motion for judgment on the pleadings based on the report—it did so based on the City of Philadelphia having licensed Appellee to rent, which was based on Appellee's compliance with the ordinance. Tr. Ct. Op. at 3 (citing Appellee's compliance with Phila. Code § 6-803(3)(b)). And, as stated above, the Appellants have not identified any provision of the ordinance or any regulation with which the inspector failed to comply. Thus, we find that there are no facts which properly must go to a jury, and Appellee's right to judgment as a matter of law is certain. Accordingly, we affirm.

Order Affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: 3/19/2025